**Roger Lee BELL, Jr., Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 2002–SC–0117–DG.

Supreme Court of Kentucky.

Oct. 23, 2003.

Rehearing Denied Jan. 22, 2004.

Timothy G. Arnold, Assistant Public Advocate, Frankfort, Counsel for Appellant.

A.B. Chandler, III, Attorney General, Courtney J. Hightower, Assistant Attorney General, Frankfort, Counsel for Appellee.

Opinion of the Court by Justice KELLER.

## I. INTRODUCTION

Appellant fled on foot from a uniformed Lexington Police Department officer who had attempted to stop Appellant and a companion because the young men matched the descriptions of suspects who were sought in connection with a First–Degree Robbery. The pursuing officer eventually apprehended Appellant after a short foot chase during which Appellant discarded a handgun that had been concealed on his person and the pursuing officer's uniform was torn as he climbed over a fence. A Fayette Circuit Court jury acquitted Appellant of the First–Degree Robbery offense, but found him guilty of the Class D felony offense of First–

Degree Fleeing or Evading Police[1] and two (2) misdemeanor offenses: Carrying a Concealed Deadly Weapon[2] and Third–Degree Criminal Mischief.[3] The trial court sentenced Appellant in accordance with the jury's verdict to a maximum five (5) year term of imprisonment. In his matter-of-right appeal, Appellant challenged each of his three (3) convictions, but the Court of Appeals affirmed the Fayette Circuit Court's judgment of conviction and sentence. Appellant then moved this Court for discretionary review, but narrowed his grounds of appeal and argued only that the trial court should have directed a verdict of acquittal as to the First–Degree Fleeing and Evading Police charge because the evidence at trial was insufficient to prove that "by fleeing or eluding, [he] . . . create[d] a substantial risk of . . . serious physical injury or death to any person[.]"[4] We granted Appellant's motion for discretionary review in order to address this interpretive issue of first impression concerning KRS 520.095(1)(b). After a review of the evidence, we agree with Appellant that the evidence was insufficient to support his conviction for First–Degree Fleeing or Evading Police.

## II. FACTUAL BACKGROUND

Count Two of the indictment returned by the Fayette County Grand Jury against Appellant charged that:

On or about the 20th day of February 1999, in Fayette County, Kentucky, the Defendant Roger Lee Bell, Jr. committed the offense of First Degree Fleeing or Evading Police by disobeying an order from a police officer to stop and in doing so created a substantial danger of death or serious injury to other [sic] person[.]

The indictment thus charged Appellant with violating the "pedestrian flight" provision of KRS 520.095:

A person is guilty of fleeing or evading police in the first degree:

. . .

(b) When, as a pedestrian, and with intent to elude or flee, the person knowingly or wantonly disobeys an order to stop, given by a person recognized to be a peace officer, and at least one (1) of the following conditions exists:

1. The person is fleeing immediately after committing an act of domestic violence as defined in KRS 403.720; or

2. By fleeing or eluding, the person is the cause of, or creates a substantial risk of, serious physical injury or death to any person or property.[5]

At trial, the evidence relevant to this charge came from Officer Rick Schad of the Lexington Police Department. During the Commonwealth's direct examination of him, Officer Schad testified that: (1) on the day in question, he was in uniform and was driving a marked police cruiser when an "attempt to locate" (or "ATL") was dispatched over his radio and he was directed to canvass a given area for two described robbery suspects who were believed to be armed with handguns; (2) he observed two young men who met the suspects' descriptions and pulled his vehicle toward the curb at which point the men turned and began walking away from the cruiser; (3) he exited his police cruiser and

1. KRS 520.095(1)(b).

2. KRS 527.020.

3. KRS 512.040.

4. KRS 520.095(1)(b)(2).

5. KRS 520.095(1).

yelled for the men to stop, but the men began running away from him; (4) he gave chase, again yelled for the men to stop, and followed as the men ran through residential backyards and scaled two chain-link fences; (5) before the men crossed a third, wire fence, which Officer Schad did not cross himself, he observed a black object, which he believed to be a handgun, "fall away" from the larger of the men he was pursuing (whom he had focused upon because the man had turned to see if he was still following and he believed he would have a better chance of catching the larger man); (6) he then ran along the wire fence line where he encountered the larger man in the backyard of a residence; (7) he scaled another fence—but was stuck for a few seconds when his pants became caught on the fence and were torn—and apprehended Appellant, who complied with Officer Schad's third request to stop; (8) at that point, he partially handcuffed the man (Appellant) and turned him over to another officer and then, at the direction of his sergeant, retraced his steps to the place where he had seen the handgun fall; (9) he located both a .40 caliber Sig Sauer semiautomatic pistol (which he described as a "high-quality" and "fantastic" firearm and stated that he would "love to own one") that was loaded with ten hollow-point bullets (one of which had been "chambered" and made ready to fire) and, a couple of feet away, a matching holster; and (10) when he found the handgun, dirt had adhered to the side of it from the impact it made with the ground, it had been on the ground for no longer than three to five minutes, and he observed no one else standing around and no passers-by during the chase. On cross-examination, Officer Schad testified that: (1) he never saw the handgun in Appellant's hand; (2) Appellant never drew the weapon or pointed in the officer's direction; and (3) he heard no sounds that he would associate with readying the handgun to fire.

After Officer Schad testified, the Commonwealth announced the close if its case, and Appellant moved the trial court for a directed verdict of acquittal on the charge of First–Degree Fleeing or Evading Police. Appellant argued that the Commonwealth's evidence did not demonstrate that his act of flight had created a substantial risk of death or serious physical injury. The Commonwealth responded to the motion by stating that it was the Commonwealth's position "that when an armed suspect flees from a police officer after a robbery, that that situation in and of itself creates a serious risk of danger or death to another person." The trial court denied Appellant's motion for a directed verdict of acquittal.

Appellant himself testified at trial and explained that he had fled from Officer Schad because he believed that there was a warrant for his arrest from an unrelated incident and also because he knew that it was illegal for him to carry a handgun because he was a juvenile at the time. On cross-examination, Appellant admitted that he had been carrying concealed upon his person a loaded handgun that was ready to be fired. Appellant maintained, however, that he was "not necessarily" trying to ditch the handgun and explained that it fell to the ground after it slipped out of his baggy pants.

The trial court denied Appellant's renewed motion for a directed verdict of acquittal and instructed the jury as follows with respect to Count Two of the indictment:

> You will find the Defendant guilty of First Degree Fleeing or Evading Police under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

A. That in this county on or about the 20th day of February, 1999, and before the finding of the Indictment herein, he knowingly or wantonly disobeyed a direction to stop, which direction was given by a person whom he recognized to be a police officer;

AND

B. That he did so with the Intent to flee or elude;

AND

C. That his act of fleeing or eluding caused or created a substantial risk of serious physical injury or death to any person.[6]

The Commonwealth argued during its closing argument that Appellant's possession of an "extremely lethal firearm" during the foot pursuit created a substantial risk of death or serious physical injury because Officer Schad was "on the whole, a lot more prudent than he should have been" by leaving his own weapon holstered during the chase. According to the Commonwealth, Officer Schad should have drawn his own handgun and perhaps fired it at Appellant, a fleeing suspected violent felon, in order to effect his arrest, and a possible resulting exchange of gunfire would have created a risk for the occupants of the residences in the vicinity, Officer Schad, or Appellant himself.

The jury found Appellant guilty, and, on appeal, the Court of Appeals agreed with the Commonwealth that the evidence supported the jury's verdict. Relying upon *Commonwealth v. Clemons*,[7] which found the fact that a defendant *pointed* a firearm at a police officer sufficient to support a First–Degree Wanton Endangerment conviction,[8] the Court reasoned that the facts of this case presented a substantial risk of armed confrontation:

> Bell did not merely possess the firearm but fled from police traveling through back yards and over fences, then ultimately threw down the loaded weapon in a populated area. Just as in *Clemons*, there was a real and substantial risk of serious injury to the officer, Bell or others in the area. It was not

---

**6.** For the sake of clarity and for the benefit of the bench and bar, we make three (3) observations with respect to paragraph (C) of this instruction. First, although KRS 520.095(1)(b)(2) also embraces "serious physical injury or death to ... any ... property," *see Lawson v. Commonwealth*, Ky., 85 S.W.3d 571, 576 n. 9 (2002) (describing KRS 520.095(1)(b)(2) as a "curious phrasing" and observing that commentators have found it "largely incoherent in light of the KRS 500.080(15) definition of 'serious physical injury.'"), the indictment in this case alleged only that Appellant's act of fleeing and eluding had "created a substantial danger of death or serious injury to other [sic] *person*." (Emphasis added). The Commonwealth did not seek to amend the indictment, and the trial court thus properly instructed only upon the allegation in the indictment. Second, although Appellant did not object to the language of paragraph (C), there is no evidence introduced that Appellant's actions actually caused death or serious physical injury, and

thus "[p]aragraph (C) of the trial court's instruction should have omitted that theory of aggravation and include[d] only the 'created a substantial risk' theory." *Id.* at 575 n. 6. Third, we observe that the trial court properly denied Appellant's request for an instruction on Second–Degree Fleeing or Evading Police as a lesser-included offense to the indicted charge. Although we express no opinion as to whether the Second–Degree Fleeing or Evading Police offense defined at KRS 520.100(1)(a) is a lesser-included offense of the felony pedestrian flight offense defined at KRS 520.095(1)(b), it is clear that KRS 520.100 did not include a misdemeanor "pedestrian flight" offense until it was amended by the 2002 General Assembly, *see* 2002 Ky. Acts ch. 350, § 8 (effective July 15, 2002) (codified at KRS 520.100(1)(b))—*i.e.*, well after the conduct at issue in this case.

**7.** Ky., 734 S.W.2d 459 (1987).

**8.** *Id.* at 461.

clearly unreasonable for the jury to find Bell guilty; the directed verdict, therefore, was properly denied.

## III. ANALYSIS

The crime of First–Degree Fleeing or Evading Police did not exist prior to 1998. Although the Model Penal Code permits a Resisting Arrest prosecution when a person charged with a crime flees from police officers if "the circumstances of flight from arrest expose the pursuing officers to substantial danger," [9] the commentary to Kentucky's Resisting Arrest statute, KRS 520.090, appears to foreclose that option.[10] However, the former KRS 520.100,[11] which was functionally the same as the current KRS 520.100(1)(b), but was then known as Resisting Order to Stop a Motor Vehicle, was an original provision of the Kentucky Penal Code that was designed to "punish eluding a police officer when the nature of the instrumentality used to accomplish the flight inherently involves the threat of dan-ger to peace officers and private citizens alike." [12]

Approximately two (2) months after the well-publicized death of Covington Police Officer Michael Partin, who fell to his death from the Clay Wade Bailey Bridge while pursuing a suspect in the line of duty,[13] the Kentucky Senate Judiciary Committee amended House Bill 455, the 1998 General Assembly's omnibus crime legislation, by adding provisions that created a new Class D felony crime of First–Degree Fleeing or Evading Police and amended the former KRS 520.100 to create a misdemeanor offense of Second–Degree Fleeing and Evading Police. When the fleeing and evading crimes became effective, one newspaper referred to those provisions of House Bill 455 as "the Partin bill." [14] KRS 520.095(1)(a) criminalizes fleeing or evading police in a motor vehicle when any one of (4) aggravating circumstances [15] is present—*i.e.*, in addition to

---

**9.** Model Penal Code and Commentaries, Part II, § 242.2, crnt. 2 (A.L.I.1980). *See also id.,* art. 242, introductory note; *Commonwealth v. Lyons,* 382 Pa.Super. 438, 555 A.2d 920 (1989) (holding that evidence was sufficient to support Resisting Arrest conviction when defendant fled police into a waist-deep frigid creek with strong current and slippery streambed). *Cf. Lewin v. United States,* 62 F.2d 619 (1st Cir.1933) (holding that evidence was sufficient to support conviction for forcibly interfering with members of the United States Coast Guard in the execution of their duties where evidence demonstrated that defendant released a smokescreen of noxious gas to enable his flight via motor boat).

**10.** KRS 520.090, Official Commentary (Banks/Baldwin 1974) ("Neither flight from arrest nor passive resistance are punishable under this section since a peace officer has the available remedy of use of reasonable force to effect the arrest.").

**11.** 1974 Ky. Acts ch. 406, § 178 (effective January 1, 1975):

(1) A person is guilty of resisting an order to stop a motor vehicle when he knowing-ly fails to obey a recognized direction to stop his vehicle, given by a person recognized to be a peace officer.

(2) No offense is committed under this section when the conduct involved constitutes a failure to comply with a directive of a traffic control officer.

(3) Resisting an order to stop a motor vehicle is a Class A misdemeanor.

**12.** KRS 520.100, Official Commentary (Banks/Baldwin 1974). *See also id.* ("The number of injuries occasioned by high speed chases and the public hazard created by them justifies treatment of the problem within the Penal Code.").

**13.** *See Robertson v. Commonwealth,* Ky., 82 S.W.3d 832 (2002).

**14.** *Officer Partin's Sacrifice,* KENTUCKY POST, July 18, 2000, *available at* http://www.kypost.com/opinion/kedita071800.html.

**15.** *See Lawson v. Commonwealth, supra* note 6 at 575 (quoting 1 Cooper, KENTUCKY INSTRUCTIONS TO JURIES § 7.36C, comment (Anderson Publishing Co., Cum.Supp.2002)).

the fleeing from authority, the defendant is "fleeing immediately after committing an act of domestic violence"; [16] driving under the influence [17] or while his or her driver's license is suspended because of DUI,[18] or "[b]y fleeing or eluding, the person is the cause, or creates substantial risk, of serious physical injury or death to any person or property[.]" [19] KRS 520.095(1)(b) criminalizes pedestrian flight from police, but requires the presence of one (1) of two (2) aggravating circumstances, *i.e.* "fleeing immediately after committing an act of domestic violence" [20] or "[b]y fleeing or eluding, the person is the cause of, or creates a substantial risk of, serious physical injury or death to any person or property." [21]

■ Although it has been suggested that the KRS 520.095(1)(a)(4) and (1)(b)(2) aggravating circumstances "give a prosecutor a means by which to charge what would otherwise be a Class A misdemeanor (wanton endangerment in the second degree) at felony grade," [22] a closer examination of the elements of Kentucky's wanton endangerment statutes, which "[are] not limited to specific types of conduct" [23] and "may be committed in many ways" [24] illustrates that KRS 520.095(1)(a)(4) and (1)(b)(2) prohibit specific conduct (fleeing or evading police officers) while incorporating elements of both the First and Second–Degree Wanton Endangerment offenses. KRS 520.095(1)(a)(4) and (1)(b)(2) require that the fleeing person create risks that are parallel to the "substantial danger of death or serious physical injury to another person" [25] required for commission of First–Degree Wanton Endangerment. And the "substantial risk of death or serious physical injury to any person or property" that KRS 520.095(1)(a)(4) and (1)(b)(2) require contemplates risks of a greater degree than the "substantial danger of physical injury to another person" [26] that is addressed in the Second–Degree Wanton Endangerment statute. However, unlike First–Degree Wanton Endangerment, which requires a showing of aggravated wantonness, *i.e.,* that the offender acts "under circumstances manifesting extreme indifference to the value of human life," [27] KRS 520.095(1)(a)(4) and (1)(b)(2) require that the defendant "knowingly or wantonly disobey an order to stop" and thus more closely parallel the elements of Second–Degree Wanton Endangerment, which requires only that the defendant "wantonly engage[ ] in conduct[.]" [28] In any event, however, we observe that the type of motorized flight from pursuing officers that is now prohibited by KRS 520.095(1)(a)(4) has, in the past, been prosecuted under the wanton endangerment statutes,[29] and we therefore recognize that

---

**16.** KRS 520.095(1)(a)(1).

**17.** KRS 520.095(1)(a)(2).

**18.** KRS 520.095(1)(a)(3).

**19.** KRS 520.095(1)(a)(4).

**20.** KRS 520.095(1)(b)(1).

**21.** KRS 520.095(1)(b)(2).

**22.** William H. Fortune & Robert G. Lawson, KENTUCKY CRIMINAL LAW, § 15–2(f) (LEXIS, cum.supp.2000).

**23.** *Hancock v. Commonwealth,* Ky.App., 998 S.W.2d 496, 498 (1999).

**24.** *Hardin v. Commonwealth,* Ky., 573 S.W.2d 657, 660 (1978).

**25.** KRS 508.060(1).

**26.** KRS 508.070(1).

**27.** KRS 508.060(1).

**28.** KRS 508.070(1).

**29.** *See Hash v. Commonwealth,* Ky.App., 883 S.W.2d 892 (1994); *Wyatt v. Commonwealth,* Ky.App., 738 S.W.2d 832 (1987). *Cf. Graves v. Commonwealth,* Ky., 17 S.W.3d 858 (2000) (holding, in a case involving a car chase be-

precedent interpreting "substantial risks" within the context of KRS 508.060 and KRS 508.070 is relevant to our interpretation of KRS 520.095(1)(a)(4) and (1)(b)(2).

 Whether a defendant's act of fleeing or eluding police creates "a substantial risk of death or serious physical injury" will, of course, "turn[ ] on the unique circumstances of an individual case." [30] Generally speaking, however, we would observe that a *substantial* risk is a risk that is "[a]mple," [31] "[c]onsiderable in … degree … or extent," [32] and "[t]rue or real; not imaginary." [33] Accordingly, it is clear that not all risks are substantial—hence the phrase "low risk"—and not every hypothetical scenario of "what might have happened" represents a substantial risk. In any trial, the issue of whether a defendant's conduct creates a substantial risk of death or serious physical injury "depends upon proof" [34] and reasonable inferences that can be drawn from the evidence.

 We review the sufficiency of the evidence to support Appellant's First–Degree Fleeing or Evading Police conviction under the standard articulated in *Commonwealth v. Benham:* [35]

> On motion for directed verdict, the trial court must draw all fair and rea-

sonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on this motion, the trial court must assume that the evidence for the Commonwealth is true, but reserv[e] to the jury questions as to the credibility and weight to be given to such testimony.

On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then is the defendant entitled to a directed verdict of acquittal.[36]

Appellant essentially admitted during his trial testimony—and virtually concedes on appeal—that he knowingly disobeyed Officer Schad's direction to stop and that he did so in recognition of the fact that Officer Schad was a police officer and with the intention of fleeing from him. Accordingly, we find the jury's findings as to paragraphs (A) and (B) of the trial court's jury instruction to be reasonable. The critical factual issue in this case, however, was reflected in paragraph (C), *i.e.*, whether Appellant's "act of fleeing or eluding

tween private actors, that the evidence supported a conviction for First–Degree Wanton Endangerment).

**30.** *Cooper v. Commonwealth*, Ky., 569 S.W.2d 668, 671 (1978).

**31.** AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed.2000).

**32.** *Id.*

**33.** *Id. See also* WEBSTER'S REVISED UNABRIDGED DICTIONARY (1996) ("Belonging to substance; actually existing; real"); *Id.* ("Not seeming or imaginary; not illusive; real; solid; true, veritable.").

**34.** *Lofthouse v. Commonwealth*, Ky., 13 S.W.3d 236, 241 (2000) (rejecting the Commonwealth's unevidenced assertion that "the act of furnishing narcotic drugs to another creates a substantial risk of death to the transferee").

**35.** Ky., 816 S.W.2d 186 (1991).

**36.** *Id.* at 187. *See also Commonwealth v. Sawhill*, Ky., 660 S.W.2d 3, 4–5 (1983) ("The clearly unreasonable test seems to be a higher standard for granting a directed verdict … constitut[ing] an appellate standard of review."); *Trowel v. Commonwealth*, Ky., 550 S.W.2d 530, 533 (1977).

caused or created a substantial risk of serious physical injury or death to any person." The Commonwealth suggests a number of "scenarios" as to how Appellant's flight while armed created a substantial risk of serious physical injury or death, but those "scenarios" can be distilled into two (2) broad categories. First, the Commonwealth argues that Appellant's handgun could have accidentally discharged while Appellant was fleeing—either while still in Appellant's possession or when it fell or Appellant threw it onto the ground. Second, the Commonwealth argues that Appellant or Officer Schad might have instigated an armed confrontation. Under the evidence presented in this case, we hold that neither the evidence presented nor the Commonwealth's "scenarios," which the Commonwealth suggests are reasonable inferences from the evidence, were sufficient to support a finding that Appellant's flight created a "substantial risk of serious physical injury or death" that will support liability under KRS 520.095(1)(b)(2).

■ Here, the Commonwealth's naked assertion that Appellant's possession and/or discarding of the handgun during his flight from Officer Schad created a risk that the handgun would accidentally fire and kill or seriously physically injure someone falls squarely in the category of insubstantial and purely theoretical risks. The Commonwealth introduced no evidence to demonstrate that a .40 caliber Sig Sauer automatic handgun would have a propensity to fire accidentally under such

circumstances. In fact, the Commonwealth introduced evidence that permitted if not suggested reasonable inferences to the contrary—e.g., Officer Schad's testimony that Appellant's handgun was "high-quality" and "fantastic"—and the prosecuting attorney referenced this testimony during his closing argument and observed that Appellant's handgun was a precision-made firearm that "was no 'Saturday-night special.'"

■ Nor did the evidence in this case permit a finding that Appellant's flight created a substantial risk of armed confrontation. Given that Officer Schad never drew his weapon and Appellant never brandished his handgun nor pointed it in Officer Schad's direction, no "shoot-out" occurred and the Commonwealth's proposed "scenario" of how Appellant created a substantial risk of one rests upon its assumption that either Appellant and Officer Schad or both might possibly have acted differently than they actually did. Admittedly, Appellant would have created a substantial risk of death or serious physical injury if he had pointed [37] or fired [38] his handgun at Officer Schad. However if he did so, his offense would be First or Second–Degree Wanton Endangerment because the risk would have been created by his separate criminal act of pointing the handgun or firing. Although that act would have been committed *during* his act of fleeing or eluding, the risk would not have been created "*by* his act of fleeing or evading" as KRS 520.095(1)(b)(2) requires.[39] The fact remains, however, that Appellant did not point his handgun at

**37.** *See Commonwealth v. Clemons, supra* note 7 at 461 ("'Pointing a firearm at a police officer who is in the performance of his duties will result in a confrontation in which gunfire is distinctly possible.... Therefore, the initial act of pointing the firearm and the forseeable [sic] response to this act may ... create a substantial danger of serious physical injury

to another person."). *See also Thomas v. Commonwealth*, Ky., 567 S.W.2d 299 (1978).

**38.** *See Hennemeyer v. Commonwealth*, Ky., 580 S.W.2d 211 (1979).

**39.** *Cf. Lawson v. Commonwealth, supra* note 6 at 576 (where the defendant's flight *itself* created the risks as he exceeded the speed limit,

Officer Schad.[40] Accordingly, in order to resolve the issue of whether Appellant's flight created a substantial risk of death, we must examine risks created "by his act of fleeing or eluding," not that might have been created if Appellant had taken independently dangerous actions during his flight.

The Commonwealth argues that Appellant's act of fleeing or eluding Officer Schad created a substantial risk that Officer Schad would seriously physically injure or kill Appellant or some other person while employing deadly force to affect Appellant's arrest. However, it is not clear from the record in this case that Officer Schad was authorized to use deadly force in this situation. And, even if it were permissible for Officer Schad to use deadly force to apprehend Appellant, that fact, standing alone, did not demonstrate a *substantial* risk that Officer Schad would utilize such force. The Commonwealth introduced no evidence regarding any Lexington Police Department policy relating to the use of deadly force in connection with arrest. Nor did the Commonwealth ask any questions of Officer Schad concerning whether he believed that he was authorized to employ deadly force in this case. The United States Supreme Court has held in *Tennessee v. Garner*[41] that "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used [without violating the federal constitution] if necessary to prevent escape, and if, where feasible, some warning has been given."[42] In Kentucky, however, KRS 503.090 contains an additional, statutory limitation on a peace officer's right to employ deadly force against a suspect, namely that the officer "believes that the person to be arrested is likely to endanger human life unless apprehended without delay."[43] There is no evidence in the record to suggest that Officer Schad believed that deadly force was necessary (or even authorized) in this case, and the fact that the officer never drew his weapon is incontrovertible evidence that Officer Schad either did not believe such force was necessary or believed that it would be imprudent. This belies the contention that Appellant's flight created a substantial risk of armed confrontation. It is the holding of this Court, therefore, that the risk that Officer Schad might have chosen to draw his weapon and employ (potentially illegal) deadly force against Appellant is, as a matter of law, far too remote to justify the jury's finding that Appellant's act of flight created a *substantial* risk of death or serious physical injury.

## IV. CONCLUSION

For the above reasons, we reverse the Court of Appeals's opinion to the extent

---

ignored traffic control devices, weaved between vehicles stopped in his path, and attempted to circumvent a roadblock by driving in the emergency lane).

**40.** *See Gilbert v. Commonwealth,* Ky., 637 S.W.2d 632, 634 (1982) ("Here, the gun was never pointed at Watson, and in the circumstances of this case it is obvious to us that the essential elements of KRS 508.060 are not present.").

**41.** 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)

**42.** *Id.* at 471 U.S. 1, 11–12, 105 S.Ct. 1694, 85 L.Ed.2d 1, 10.

**43.** KRS 503.090(2)(c). *See also Tennessee v. Garner, supra* note 41 at 471 U.S. at 17 n. 18, 85 L.Ed.2d at 13 n. 18 (emphasizing KRS 503.090(2)(c) is in addition to KRS 503.090(2)(b), which requires that the arrest be for a "felony involving the use or threatened use of physical force likely to cause death or serious physical injury.")

that it affirms Appellant's First–Degree Fleeing or Evading Police conviction, but affirm the opinion in all other respects. We remand the case to the Fayette Circuit Court for entry of an order dismissing Count Two of the indictment.

LAMBERT, C.J.; COOPER, GRAVES, JOHNSTONE and STUMBO, JJ., concur.

WINTERSHEIMER, J., dissents by separate opinion.

WINTERSHEIMER, Justice, Dissenting.

I respectfully dissent from the majority opinion because the trial judge acted properly in overruling Bell's motion for a directed verdict because sufficient evidence was presented so that a rational trier of fact could have found him guilty of first-degree fleeing and evading police, pursuant to KRS 520.095.

The facts of this case indicate that Bell, armed with a weapon, ran from a police officer who had ordered him to halt. The officer chased Bell through several back yards and over a fence before catching him. This was sufficient evidence for a jury to believe that the flight created a substantial risk of serious physical injury or death.

Anything can happen during a chase situation involving alleged criminal conduct. *See Robertson v. Commonwealth*, Ky., 82 S.W.3d 832 (2002). Particularly when the chase involves an armed suspect, the risks are numerous and the first-degree fleeing and evading statute is meant to reduce the dangers involved and punish the offenders.

The trial judge was correct in overruling the motion for a directed verdict by Bell. I would affirm the conviction in all respects.