# IMPORTANT NOTICE
## <u>NOT TO BE PUBLISHED OPINION</u>

**THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.**

RENDERED: AUGUST 14, 2025
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2024-SC-0241-MR

VIRGIL LEE EVANS, JR.                                                  APPELLANT

V.

ON APPEAL FROM KENTON CIRCUIT COURT
HONORABLE PATRICIA M. SUMME, JUDGE
NO. 23-CR-00802

COMMONWEALTH OF KENTUCKY                                APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

This case involves a jury trial in Kenton County on charges of first-degree burglary, first-degree fleeing and evading the police, tampering with physical evidence, receiving stolen property (firearm), and being a first-degree persistent felony offender. Appellant, Virgil Evans ("Evans"), was convicted after a two-day trial of first-degree burglary, first-degree fleeing and evading the police, and being a first-degree persistent felony offender. The jury acquitted him on the charges of tampering with physical evidence and receiving stolen property (firearm). The jury recommended a sentence of 25 years, and the trial court sentenced Evans in conformity with the recommendation. Evans now appeals to this Court as a matter of right. Ky. Const. § 110(2)(b). After careful review, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellant Evans has a daughter named Jessica Barns ("Ms. Barns") with whom he does not share a close father-daughter relationship. The record reflects she did not meet him for the first time until she was five or six years old. She testified Evans suffered from a substance use disorder, was homeless at the time of the incidents herein, and that she only saw him a few times a year. As a result of this difficult situation, she and her husband, Corey Barns ("Mr. Barns"), did not permit Evans to come into her home without their permission.

On June 8, 2023, Evans came to Ms. Barns' home in the evening. Ms. Barns had gone to bed early that night because she had to work beginning at 5 am the next morning. At some point around 8 pm or 9 pm, while she was sleeping, Ms. Barns heard knocks on her door that she believed to be Evans. Ms. Barns ignored the knocking, and Evans then moved to knocking on her bedroom window and air conditioning unit. In a similar posture, her husband also needed to wake up early the next morning for work, and he heard and was awakened by Evans' knocking. Both Barnses testified that when they woke up, they discovered that Mr. Barns' .45 caliber firearm was taken from their home. Ms. Barns immediately reported the burglary and theft of the gun to the Covington Police Department. The Barnses reported to the police that they believed it was Evans who had broken into their home via the door or window and taken the gun.

In fact, this version of the story was corroborated by Evans himself in his trial testimony. Evans testified he knocked on the door despite knowing that they were ignoring him. He testified that he finally entered the home without being given permission. Evans acknowledged that he took the gun and, at one point, said that he intended to use it to kill himself. He also testified that he took the gun for his own safety. Evans stated he did not take any other items from the residence at that time. Evans testified he was knocking on his daughter's door the evening in question to get help from her.

After the burglary, Evans testified he slept for a while in a homeless camp and began riding a bike around town. Officer Samuel Matthews ("Officer Matthews") with the Covington Police was on his way to work when he saw Evans on the street riding the bike. Officer Matthews was aware that Evans was a burglary suspect in an incident in which a gun was stolen. Because of these facts, Officer Matthews contacted police dispatch. Officer Matthews stated Evans appeared to have a gun in the waistband of his pants.

Officer Kyle Shepard ("Officer Shepard") also responded to the scene. He testified that he witnessed Evans riding the bike and that Evans almost ran into the police car he was driving. Upon the near miss, Officer Shepard exited his police vehicle and asked Evans to stop. Evans pedaled away from law enforcement on his bike, and Officer Shepard pursued on foot. Evans only stopped when he later crashed the bike. He was caught by a bystander blacktopping a driveway who opened a fence gate into his oncoming path. Evans agreed in his own testimony that when he wrecked into the gate, he

pushed the gun away from himself out of fear of being shot by the police. Evans knew having a weapon on his person would escalate his interaction with law enforcement.

For his part, Officer Shepard drew his service weapon and pointed it at Evans because he could not see his hands. Officer Shepard then placed Evans in handcuffs at which time he saw the gun next to the tire of a parked vehicle along that same sidewalk. Officer Shepard's bodycam footage was shown to the jury at trial corroborating these facts. Two bystanders can be seen behind Evans in the area where the officer held him at gunpoint. The two bystanders were an uncle and nephew; one of them saw Evans throw something from his waistband area, and the other owned the car that the stolen gun was found beneath. A third officer, James Miskanin, ("Officer Miskanin") also with the Covington Police, witnessed Officer Shepard draw his weapon and point it at Evans. Officer Miskanin was able to recover the jettisoned weapon from under the vehicle.

Evans went to the hospital immediately after the incident as he seemed to have a seizure, and ultimately, was charged and taken to the Kenton County Detention Center. Detective Matthew Martin ("Det. Martin") was assigned to investigate the case. Det. Martin interviewed Evans about the incident and the jury watched the interview at trial. In addition, the Commonwealth also introduced recorded phone calls made from the jail by Evans to his mother trying to convince her to ask Ms. Barns to change her story or drop the

charges. Evans testified at trial that he had had a history of using drugs and was in relapse at the time of the incident.

Evans moved for a directed verdict at the end of the Commonwealth's case and again at the end of all the proof. In that motion he conceded there was sufficient evidence to submit the first-degree burglary charge to a jury, but argued there was insufficient evidence to support the fleeing and evading charge. He argued there was a lack of substantial risk of harm and that Officer Shepard was not authorized to fire per police use-of-force policy. The trial court overruled the motion for a directed verdict, and the jury found Evans guilty of first-degree burglary and first-degree fleeing and evading. He was acquitted of the charges of tampering with evidence and receiving stolen property (firearm). He was later convicted of being a first-degree persistent felony offender and received an enhanced sentence of 25 years to serve. This appeal follows.

**ANALYSIS**

Evans raises two issues for the Court's review. First, whether he was entitled to a directed verdict on the charge of first-degree fleeing and evading the police, and second, whether the trial court erred by not giving a jury instruction for voluntary intoxication. As a preliminary matter, the Court finds these issues are properly preserved for review. Evans raised both a motion and argument for a directed verdict on the fleeing charge at the close of the Commonwealth's case-in-chief and subsequently renewed the motion at the close of the defendant's proof. The trial court overruled Evans' motion for

5

directed verdict on this charge. For the second issue, Evans requested and argued for a jury instruction on voluntary intoxication and first-degree burglary. After consideration and taking additional time to pause and research the issue of voluntary intoxication, the trial court denied the motion to give the instruction. We will review each issue in turn.

**I. The Trial Court Correctly Found That Evans Was Not Entitled to A Directed Verdict on the Fleeing and Evading Charge.**

The standard of review for an appeal of the denial of a directed verdict motion is when taking all the evidence as a whole, in the light most favorable to the Commonwealth, if it would be clearly unreasonable for a jury to find guilt, then the defendant is entitled to a directed verdict of acquittal. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Commonwealth v. Sawhill*, 660 S.W.2d 3, 5 (Ky. 1983); *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991). This standard is articulated clearly in *Culver v. Commonwealth,* in which this Court held the trial court's denial of a directed verdict may only be reversed by an appellate court when examining the evidence, it would be clearly unreasonable for a jury to find guilt on the charge. 590 S.W.3d 810, 813 (Ky. 2019) (citing *Benham*, 816 S.W.2d at 187).

Kentucky Revised Statute (KRS) 520.095 outlines the charge of first-degree fleeing or evading the police. The statute provides in pertinent part:

(1) A person is guilty of fleeing or evading police in the first degree:

(a) When, while operating a motor vehicle with intent to elude or flee, the person knowingly or wantonly disobeys a direction to stop his or her motor vehicle, given by a person recognized to be a police officer, and at least one (1) of the following conditions exists:

6

. . .

> 4. By fleeing or eluding, the person is the cause, or creates substantial risk, of serious physical injury or death to any person or property[.]

(b) When, as a pedestrian, and with intent to elude or flee, the person knowingly or wantonly disobeys an order to stop, given by a person recognized to be a peace officer, and at least one (1) of the following conditions exists:

. . .

> 2. By fleeing or eluding, the person is the cause of, or creates a substantial risk of, serious physical injury or death to any person or property.

KRS 520.095(1)(a)(4.), (b)(2.) (1998) (amended 2024). Based upon the language of this statute, Evans was a pedestrian at the time of this incident. Neither his testimony nor the officer's places him in a motor vehicle on the day this happened. The evidence established he was pedaling a bike at the time of his police confrontation. Accordingly, the Commonwealth must establish that he disregarded an order to stop by the police and he thereby created a substantial risk[1] of physical injury or death. KRS 520.095(1)(b)(2.) (1998) (amended 2024).

The Commonwealth put forward proof that Evans created such a risk. The Commonwealth relied upon the substantial risk prong of the statute and argued Evans' act of pedaling away from the police with a gun caused a potentially dangerous and deadly situation. Officer Shepard needed to point his gun in Evans' direction to protect his own safety against an armed and

---

[1] KRS 520.095(1)(b)(2.) was amended in 2024 to delete the "substantial risk" language and now only requires "cause".

7

uncooperative suspect. The very act of brandishing his gun in a residential area created a dangerous situation for the pedestrian bystanders in the line of fire. The Commonwealth contended that Officer Shepard believed Evans to be an imminent threat and had a reasonable need to hold him at gunpoint.

Both sides cite the case of *Bell v. Commonwealth*, 122 S.W.3d 490 (Ky. 2003). In *Bell*, an officer in the line of duty observed two suspects who matched the description from a previous robbery and requested them to stop. *Id.* at 491-92. The officer in *Bell* gave chase and ran through residential yards and fences. *Id.* at 493. During the pursuit, one of the suspects dropped an object near a fence that was ultimately determined to be a gun. *Id.* In *Bell*, the Court held that a defendant discarding a loaded handgun during flight from the police did not create a substantial risk of harm when the officer involved never drew his weapon and the defendant never brandished a handgun. *Id.* at 498. Like *Bell*, Evans argues he did not point his gun at anyone, that the bystanders did not testify that they were afraid of him, and that he did not actually injure them.

Conversely, the Commonwealth argues that it did not rely on Evans' behavior in pointing a gun, but instead relies on the fact that Evans had a visible gun on his person, was a suspect fleeing from a burglary, fled from police after a command to stop, and thereby required the officer in pursuit to use his weapon. As previously stated, Officer Shepard in pursuit of Evans could not see his hands and as a result, pointed his service weapon in the vicinity of Evans as well as innocent bystanders. The officer believed it

8

necessary to continue to brandish his weapon until Evans' hands were safely restrained in cuffs. It is logical that an officer would not want to approach a non-cooperative, armed subject without a means to protect themself.

We find this scenario distinguishable from the facts in *Bell* because unlike the officer in *Bell*, the officer here did in fact draw his weapon. While Evans argues the risk of any danger was far too remote to instruct the jury on a pedestrian fleeing and evading, it is clear from the facts that Evans did not comply with an order by law enforcement to stop and that he never stopped for the officers of his own volition. Evans was only stopped by running into an open gate. This created a volatile situation with the possibility of an officer using deadly force with innocent bystanders in harm's way. This evidence is sufficient for the trial court to determine, in its discretion, that a reasonable trier of fact could examine these facts and reach such a decision. In the unique circumstances of this case, there is a jury question created about whether Evans' actions created a substantial risk of harm.

In a case involving a charge of wanton endangerment, this Court previously held that pointing a loaded firearm at a police officer results in a confrontation in which gunfire is distinctly possible. *Commonwealth v. Clemons,* 734 S.W.2d 459 (Ky. 1987). The Court noted that anyone faced with a confrontation of a similar nature may believe it is necessary to fire a weapon in self-protection. *Id.* at 461. This type of interaction creates an "explosive environment." *Id.* While acknowledging that there is not an allegation here of Evans pointing the gun he was carrying, the Commonwealth argued the

9

discussion of the volatile environment created by a weapon being brandished is applicable to the situation here.

In *Culver,* an officer's testimony that they were forced in a pursuit more than 10 to 20 miles per hour over the speed limit along a curvy roadway was sufficient evidence of danger for the instruction. 590 S.W.3d at 817. The *Culver* Court noted that when assessing a motion for a directed verdict, the trial court must consider the evidence tendered by the Commonwealth, assume it is true, and draw all inferences in its favor. *Id.* at 813. Here the risk created by placing innocent citizens in the line of fire is analogous to a citizen's potential to be struck by a moving vehicle. For these reasons, we find the trial court did not err in failing to grant a directed verdict on the fleeing and evading charge.

## II. The Trial Court Did Not Err in Failing to Give a Voluntary-Intoxication Instruction.

Evans requested a voluntary intoxication instruction be provided to the jury both in his tendered instructions and in argument to the trial court. Because the allegation of error is preserved, a trial court's refusal to give a jury instruction is reviewed under an abuse of discretion standard. *Berry v. Commonwealth,* 680 S.W.3d 827, 837 (Ky. 2023) (citing *Brafman v. Commonwealth,* 612 S.W.3d 850, 857 (Ky. 2020)). Further, because a trial court's decisions in the drafting of jury instructions are "necessarily based upon the evidence presented at the trial, the trial judge's superior view of that evidence warrants a measure of deference from appellate courts that is reflected in the abuse of discretion standard." *Sutton v. Commonwealth,* 627

10

S.W.3d 836, 848-49 (Ky. 2021) (quoting *Sargent v. Shaffer,* 467 S.W.3d 198, 203 (Ky. 2015), *overruled on other grounds by Univ. Med. Ctr., Inc. v. Shwab,* 628 S.W.3d 112 (Ky. 2021)).  The test for a trial court's abuse of discretion is whether the decision not to include the instruction was arbitrary, unreasonable, or unsupported by sound legal principles.  *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky. 1999).

Furthermore, the defense of voluntary intoxication is an affirmative defense.  *Luna v. Commonwealth,* 460 S.W.3d 851, 882 (Ky. 2015).  This shifts the burden of proof to the defendant.  *Id.*  KRS 501.080(1) provides that voluntary intoxication is a defense to a charge only if the level of intoxication can be said to negate the existence of an element of the offense.  Here, where the charge of first-degree burglary is a specific-intent crime, Evans would need to present evidence to establish he lacked the ability to form the requisite intent.  In *Commonwealth v. Tate,* we held that voluntary intoxication would negate culpable conduct only if the defendant "was unable to form a culpable mental state essential to the commission of a given offense."  893 S.W.2d 368, 372 (Ky. 1995).

Evans testified in his own defense at trial.  Evans testified he used drugs that day and was in relapse.  He stated that he has a long history of methamphetamine use and substance use disorder.  He further explained the drug he used the day of the encounter was methamphetamine.  He outlined that he was homeless and not eating well at the time of this incident.  He went

11

to his daughter's home that evening in the hope of getting help. Evans also remembered entering the house without permission and taking a gun.

Here, it is noteworthy that the trial court included a voluntary intoxication instruction in its original draft instructions tendered to the parties. Nevertheless, after reviewing the testimony at trial, the trial court removed the instruction explaining that the instructions must be based upon the proof as presented. While Evans testified he used drugs that day and stated that he has a long history of methamphetamine use, he also knew he went to his daughter's home that evening in the hope of getting help. Evans remembered entering the house without permission and taking the gun. Arguing both he knew why he was there and the reasons he took the actions at issue while also arguing he lacked the capacity to engage in intentional conduct seem to be contradictory opposites.

Evans relies on *Mishler v. Commonwealth*, in which the Court found reversible error for not instructing the jury on voluntary intoxication in a case where the defendant testified at the very moment of the robbery at issue, he lost his memory and did not know what he was doing. 556 S.W.2d 676, 680 (Ky. 1977). The Court held that his testimony about blacking out entitled him to the instruction. *Id.* The *Mishler* Court found the "blackout testimony" sufficient, even if "preposterous" to justify the giving of an instruction. *Id.*

Notably, here no such testimony about a complete memory failure or blackout exists. As previously noted, Evans testified as to his reasons for entering his daughter's home as well as his reasons for taking the gun. He

12

proffered a couple of reasons for his actions that night in his own testimony thus negating a simultaneous argument he was so intoxicated he did not know what was happening. At no point did he deny memory of these incidents.

In *Brafman*, this Court concluded the trial court did not abuse its discretion by refusing to give a voluntary intoxication instruction in a murder trial in which the only evidence proffered by the defendant was her own testimony that she had been awake for five days and using methamphetamine while drinking whiskey. 612 S.W.3d 857-59. In *Luna*, the Court also said there must be evidence reasonably sufficient to prove the defendant was so under the influence as he did not know what he was doing. 460 S.W.3d at 882.

The trial court found there was insufficient evidence that Evans was intoxicated to the extent he was incapable of forming intent. In making this ruling, the trial court correctly held that voluntary intoxication as an affirmative defense shifts the burden of proof to the defense. The trial court further held that Evans was required to put forth sufficient evidence of intoxication to negate his intent to enter and take the weapon. This Evans simply failed to do.

For all of these reasons, the trial court did not err in finding under these facts that no reasonable juror could have found that Evans was unaware of his actions and incapable of forming intent. Thus, the trial court did not err in failing to provide this instruction.

13

## CONCLUSION

For the forgoing reasons, we affirm the judgment and sentence of the Kenton County Circuit Court.

All sitting. Lambert, C.J.; Bisig, Conley, Goodwine, Keller, Nickell, JJ., concur. Thompson, J., concurs in result only.

COUNSEL FOR APPELLANT:

Jennifer Wade
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Melissa A. Pile
Assistant Attorney General

14