RENDERED: OCTOBER 20, 2022
TO BE PUBLISHED

# Supreme Court of Kentucky

### 2021-SC-334-MR

MARK EUGENE KELLY          APPELLANT

V.
       ON APPEAL FROM MARION CIRCUIT COURT
HONORABLE SAMUEL TODD SPALDING, JUDGE
NO. 20-CR-000154

COMMONWEALTH OF KENTUCKY          APPELLEE

**OPINION OF THE COURT BY JUSTICE VANMETER**

**<u>AFFIRMING</u>**

Mark Eugene Kelly appeals as a matter of right[1] from the Marion Circuit Court judgment sentencing him to twenty-years' imprisonment for his convictions of unlawful imprisonment first-degree (three counts), wanton endangerment first-degree (three counts), and criminal trespass first-degree. On appeal Kelly raises four claims of error. Having reviewed the record and the arguments of counsel, we affirm the trial court's judgment in all respects.

## I.     Facts and Procedural Background.

On the evening of August 21, 2020, either because of an acute mental health emergency or as a result of methamphetamine use, Kelly became increasingly paranoid that he was being surveilled by persons unknown. Kelly

---

[1] Ky. Const. § 110(2)(b).

first locked himself in his own bedroom, then later climbed through his window to find shelter elsewhere, taking with him his cell phone, his fiancée's cell phone, and a gun. Kelly wandered through the night in the area around his home, and on the morning of August 22 he came to the home of Melissa Mattingly. Kelly attempted to enter the home but was unsuccessful. Mattingly was not home at the time but was alerted by her home security system of Kelly's presence. Mattingly contacted law enforcement.

After his unsuccessful attempt to enter the Mattingly home, Kelly found his way to the home of Terry Lee, who was sitting on his front porch with his 11-year-old granddaughter, S.K. Kelly approached the two, gun in hand, and told them he wanted to contact the FBI or CIA and asked whether anybody was inside the Lee home. Terry answered in the negative, but Kelly proceeded to enter the home and ordered Terry and S.K. to go inside with him. Terry testified he felt he had no choice but to comply given Kelly's erratic behavior and possession of the gun.

Once in the home, Kelly locked the doors and took Terry's and S.K.'s cell phones. When S.K. asked if she could leave to check on her younger sister, Kelly told her she could not. After a few minutes, Jon Peter, Terry's son and S.K.'s uncle, came to check on S.K. Jon Peter knocked on the door and was met by Terry who attempted to warn him. However, when Kelly noticed Jon Peter at the door, he pointed his gun at Jon Peter and ordered him inside the home. As Kelly pointed his gun at Jon Peter, S.K. came to Jon Peter's side and

Jon Peter pulled S.K. close to him to shield her. Eventually, Kelly told Jon Peter to put his hands behind his head and to sit on the floor.

Roughly five minutes later, Blake Blandford, S.K.'s father, arrived at the Lee home and knocked on the door. This time, Blandford saw Kelly, retreated from the front porch, reached for his pistol, and called for Kelly to let S.K. go. During this moment, S.K. ran out the front door to her father. Blandford took S.K. home, left her with his father, S.K.'s other grandfather, and told them to call law enforcement. Officers arrived at the Lee household in short order, having already been in the neighborhood looking for the perpetrator of the attempted break-in at the Mattingly home.

Officers eventually made contact with Kelly and asked him to let Terry and Jon Peter go. Kelly refused. After this initial interaction, Kelly became more frantic, waving around the gun with Terry and Jon Peter still in the room with him. Ultimately, Kentucky State Police troopers were able to convince Kelly to relinquish his weapon and exit the home. No one was physically injured during the incident.

Kelly was indicted on one count of first-degree burglary, three counts of first-degree unlawful imprisonment, and three counts of first-degree wanton endangerment. After a three-day jury trial, Kelly was convicted of criminal trespass (in this case, a lesser-included offense of first-degree burglary), three counts of first-degree unlawful imprisonment, and three counts of first-degree wanton endangerment. The jury recommended a total sentence of

3

imprisonment of twenty years and the trial court followed the recommendation of the jury. Kelly now appeals from that judgment.

## II. Analysis.

Kelly presents four arguments. First, he contends the trial court erred in denying his motion for a directed verdict on the counts relating to Terry and S.K. Second, he argues that his convictions for first-degree wanton endangerment and first-degree unlawful imprisonment violate the prohibition on double jeopardy. Third, Kelly claims the trial court improperly allowed evidence of a prior incident of unlawful imprisonment. Finally, he contends that statements made by the Commonwealth during sentencing amount to prosecutorial misconduct. We address each argument in turn.

### A. Directed Verdict.

Kelly first argues that the trial court erred in denying his motion for directed verdict on the charges relating to Terry and S.K. as the evidence presented was insufficient to establish first-degree wanton endangerment and first-degree unlawful imprisonment as to those victims. We hold the trial court did not err.

"If under the evidence as a whole it would not be clearly unreasonable for a jury to find the defendant guilty, [a defendant] is not entitled to a directed verdict of acquittal." *Commonwealth v. Sawhill*, 660 S.W.2d 3, 5 (Ky. 1983) (quoting *Trowel v. Commonwealth*, 550 S.W.2d 530, 533 (Ky. 1977)). In making this assessment,

> the trial court must draw all fair and reasonable inferences from
> the evidence in favor of the Commonwealth. If the evidence is

4

sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

*Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky. 1991). Ultimately, "[s]o long as the Commonwealth produces more than a mere scintilla of evidence to support the charges, a defendant's motion for directed verdict should be denied." *Taylor v. Commonwealth,* 617 S.W.3d 321, 324 (Ky. 2020).

Kelly's challenge involves his convictions for first-degree wanton endangerment and first-degree unlawful imprisonment as to Terry and S.K. Kelly does not challenge his convictions as they relate to Jon Peter on these grounds. Because a different analysis is required for the different offenses, we address each in turn, beginning with Kelly's wanton endangerment convictions.

*1. Wanton Endangerment.*

To be found guilty of first-degree wanton endangerment, a person must "under circumstances manifesting extreme indifference to the value of human life, [] wantonly engage[] in conduct which creates a substantial danger of death or serious physical injury to another person." KRS[2] 508.060(1). Kelly frames his argument around testimony that he never pointed his gun at Terry or S.K.—only Jon Peter—and asserts the Commonwealth could not have established Kelly created a "substantial danger of death or serious physical injury" as to either of those victims.

---

[2] Kentucky Revised Statutes.

5

In support, Kelly points the court to *Swan v. Commonwealth*, 384 S.W.3d 77 (Ky. 2012). In that case, Marcus Swan and D'Andre Owens entered the home of Brandon Lumpkins where he and some of his family and friends were gathered. Swan entered the home masked and gloved, armed with guns, and ordered everyone within sight into a single room. With everyone gathered, the assailants fired several shots, some at individuals, others at walls or the ceiling. Unbeknownst to the assailants, Lumpkins' mother was hidden under the bed in a back bedroom.

Swan and Owens were convicted of a number of charges, including six counts of first-degree wanton endangerment. On appeal, Owens argued that he was entitled to a directed verdict as to Lumpkins' mother, the only victim not present in the living room. We agreed, stating "[t]he offense alleged to have been committed against her does not fit clearly with the quintessential examples of first-degree wanton endangerment." 384 S.W.3d at 103. Importantly, we noted the facts that Ms. Lumpkins was in a separate room, that no shot was ever fired at the room, and that during a brief moment when she peeked out of the room, she was unnoticed and no gun was ever pointed at her. *Id.* at 103-04. We also noted that even though Swan and possibly Owens entered the room while armed, "[m]erely being in the presence of guns, even when wielded by persons who are intent on harming and terrorizing, is not sufficient by itself to create a wanton-endangerment crime." *Id.* at 104. Accordingly, we found the trial court should have granted a directed verdict on the first-degree wanton endangerment charge as related to Ms. Lumpkins.

6

Notwithstanding our decision in *Swan,* the first-degree wanton endangerment convictions as to both S.K. and Terry are fully merited**.** As to S.K., we have long held that pointing a gun at another person supports a wanton endangerment charge. *See Commonwealth v. Clemons*, 734 S.W.2d 459, 461 (Ky. 1987) (pointing a firearm at law enforcement supported first-degree wanton endangerment charge); *Thomas v. Commonwealth*, 567 S.W.2d 299, 301 (Ky. 1978) (pointing a gun at a person supports wanton endangerment even if the weapon was inoperable), *overruled on other grounds by Ray v. Commonwealth*, 611 S.W.3d 250 (Ky. 2020); *Key v. Commonwealth*, 840 S.W.2d 827, 829 (Ky. App. 1992) (holding that the pointing of a gun, whether loaded or unloaded (provided reason exists to believe the gun may be loaded), at any person constitutes conduct, under KRS 508.060(1), that "creates a substantial danger of death or serious physical injury to another person[]").

In this case, evidence adduced at trial showed that when Kelly pointed the gun at Jon Peter, S.K. was standing next to Jon Peter and Jon Peter pulled S.K. close to him to use his body as a shield between S.K. and the gun. The substantial danger presented to Jon Peter as Kelly pointed his gun at him was, by virtue of their positioning, also present with regard to S.K. The evidence presented at trial supported the jury's conclusion that Kelly had committed first-degree wanton endangerment with regard to S.K. The trial court did not err in denying the motion for directed verdict as it related to that count.

While-the situation for Terry is different, we nevertheless hold that the evidence was sufficient to support the charge of wanton endangerment. Here, Kelly wielded a 9-millimeter handgun, waving it around in manner that increased the probability that discharge may occur. Terry was within the immediate area within which such conduct "create[d] a substantial danger of death or serious physical injury." KRS 508.060(1). These facts contrast to those in *Swan*, in which we noted that "unlike the victims in the front room, Ms. Lumpkins was not present when Owens and his confederate were waving their guns around haphazardly and making threats." 384 S.W.3d at 103.[3] Thus, *Swan* does not mandate the result Kelly seeks.

Likewise, *Gilbert v. Commonwealth*, 637 S.W.2d 632 (Ky. 1982), does not support Kelly's argument. In that case, the defendant entered a store and placed a gun on a counter with his hand rested on it, but did not point at the employee. 637 S.W.2d at 634. Significantly, the defendant neither brandished nor wielded the gun in her presence in the manner as Kelly did in this case.

The trial court did not err in denying Kelly's motions for directed verdict as to the wanton endangerment charge with respect to Terry.

---

[3] Following this analysis, we included the statement quoted above that "[m]erely being in the presence of guns, even when wielded by persons who are intent on harming and terrorizing, is not sufficient by itself to create a wanton-endangerment crime." *Swan* at 104. The proof in *Swan*, however, was equivocal as to whether either defendant was armed even had either entered the bedroom where Ms. Lumpkins was hiding.

*2. Unlawful Imprisonment.*

Regarding the two counts of first-degree unlawful imprisonment, we find no error on either count. Under KRS 509.020(1), "[a] person is guilty of unlawful imprisonment in the first degree when he knowingly and unlawfully restrains another person under circumstances which expose that person to a risk of serious physical injury." Our legislature has defined "serious physical injury" to mean, "physical injury which creates a substantial risk of death, or which causes serious and prolonged disfigurement, prolonged impairment of health, or prolonged loss or impairment of the function of any bodily organ." KRS 500.080(15).

Importantly, for conduct to be considered first-degree unlawful imprisonment, it need only create a *risk* of any of the above, and this element distinguishes this offense from the "substantial danger" requirement of first-degree wanton endangerment. *See Bell v. Commonwealth*, 122 S.W.3d 490, 497 (Ky. 2003) (interpreting substantial danger to mirror substantial risk and noting, "a substantial risk is a risk that is [a]mple, [c]onsiderable in . . . degree . . . or extent, and [t]rue or real; not imaginary. Accordingly, . . . not all risks are substantial—hence the phrase 'low risk'—and not every hypothetical scenario of 'what might have happened' represents a substantial risk." (internal quotations omitted)). The omission of the word "substantial" in KRS 509.020(1) indicates that a lower degree of risk is necessary to find a defendant guilty of first-degree unlawful imprisonment.

Here, Kelly's behavior created a sufficient risk of serious physical injury to both Terry and S.K. such that the trial court did not err in denying Kelly's motion for directed verdict on these convictions. Clearly, Kelly's conduct toward S.K. and Terry was sufficient, our having already found Kelly's act of pointing his gun in the direction of S.K. created a substantial risk as to support his first-degree wanton endangerment charge. As to Terry, Kelly, with his gun in hand, ordered Terry into the home and confined him there. As the incident wore on and Kelly became less stable, he waved the loaded gun around as he engaged in negotiations with law enforcement. Though Kelly never pointed the gun at Terry, Kelly's actions nonetheless did create a risk of serious physical injury to Terry, an injury that could have been easily realized through the inadvertent discharge of the weapon and an unfortunate ricochet of the bullet. That risk was not lower than the threshold set by KRS 509.020. The trial court was accordingly correct to deny Kelly's motion for directed verdict as to the two first-degree unlawful imprisonment charges.

## B. Double Jeopardy.

Kelly next argues that his convictions for first-degree wanton endangerment and first-degree unlawful imprisonment violate the double jeopardy clause of the United States and Kentucky constitutions. Specifically, he argues (1) the convictions for the two sets of crimes arise from the same conduct; and (2) the two sets of crimes required the jury to find two inconsistent mental states.

10

Kelly did not raise this issue before the trial court; however, "the constitutional protection against double jeopardy is not waived by failing to object at the trial level." *Walden v. Commonwealth*, 805 S.W.2d 102, 105 (Ky.1991) *overruled on other grounds* by *Commonwealth v. Burge*, 947 S.W.2d 805 (Ky.1996). We accordingly review the asserted double jeopardy violation for palpable error. *Cardine v. Commonwealth*, 283 S.W.3d 641, 653 (Ky. 2009) (stating "double jeopardy violations can be addressed as palpable error because the nature of such errors is to create manifest injustice[]").

In assessing double jeopardy, Kentucky uses the *Blockburger*[4] test and applies our statutory double jeopardy provision, KRS 505.020. *Terry v. Commonwealth*, 253 S.W.3d 466, 470 (Ky. 2007); *Burge*, 947 S.W.2d at 811. "We are to determine whether the act or transaction complained of constitutes a violation of two distinct statutes and, if it does, if each statute requires proof of a fact the other does not." 947 S.W.2d at 811. Our double jeopardy analysis focuses solely on "whether each statute, on its face, contains a different element," *Dixon v. Commonwealth*, 263 S.W.3d 583, 591 (Ky. 2008), and "not the charging information, jury instruction, underlying proof needed, or the actual evidence presented at trial." *Id.* at 591 n. 30 (quoting 21 Am.Jur.2d *Criminal Law* § 302 (2008)).

Convictions for both first-degree wanton endangerment and first-degree unlawful imprisonment are not violative of the double jeopardy clause under

---

[4] *Blockburger v. United States*, 284 U.S. 299 (1932).

11

the *Blockburger* test. Unlawful imprisonment requires proof of an element not required for wanton endangerment, namely that a person "knowingly and unlawfully restrain[] another person." KRS 509.020(1). Kelly's claim fails in that regard.

Kelly also asserts the facts used to establish his convictions for both sets of offenses were the same and therefore violative of statutory double jeopardy. KRS 505.020, our "statutory double jeopardy" provision, prohibits convictions for more than one offense when "one offense is included in the other" which is the case when both offenses are "established by proof of the same or less than all the facts." KRS 505.020(1)(a), (2)(a).

Reasonable jurors could have concluded Kelly was guilty of both crimes because two discrete events occurred. Though the three victims were detained in the home for the duration of the incident, the specific acts constituting wanton endangerment were discrete and distinguishable from those acts that support unlawful detention. The wanton endangerment convictions arose from moments in the incident wherein Kelly pointed the gun at Jon Peter and S.K., placing them momentarily at a greater risk of injury and justifying first-degree wanton endangerment, and brandished his gun in a manner that placed Terry at risk of injury. Initially, none of the three was restrained. Kelly's unlawful imprisonment convictions for S.K., Terry and Jon Peter stemmed from his other actions that day, including forcing S.K. and Terry into the home while brandishing a weapon, forcing them to remain in the home, confiscating their cell phones, and waving his gun during the standoff with law enforcement

12

while refusing to release Jon Peter to police. This result is consistent with our reasoning in other cases. *See Kiper v. Commonwealth,* 399 S.W.3d 736, 745 (Ky. 2012) (holding "KRS 505.020 does not bar the prosecution or conviction upon multiple offenses arising out of a single course of conduct when the facts establish that two or more separate and distinct attacks occurred during the episode of criminal behavior[]" (citing *Welborn v. Commonwealth,* 157 S.W.3d 608, 611–12 (Ky.2005))); *Dixon,* 263 S.W.3d at 592 (ruling existence of two separate physical injuries allowed jurors to find guilt of first-degree assault and first-degree rape); *Robbins v. Commonwealth,* No. 2015-SC-000478, 2017 WL 5494103 at *10 (Ky. Mar. 23, 2017) (finding no violation of statutory double jeopardy in conviction for First–Degree Wanton Endangerment and First–Degree Unlawful Imprisonment where jury could have based convictions on multiple incidents that occurred between defendant and victim while she was kept in the home with defendant).

Kelly's argument regarding the inconsistent mental states for unlawful imprisonment and wanton endangerment fails for the same reason. Just as the jury reasonably could have identified multiple acts that supported their respective findings, so too could the jury find varying mental states present in those acts. At the time Kelly pointed his gun at S.K. and Jon Peter, the jury could have found he was acting wantonly. At the time Kelly refused to release Jon Peter to law enforcement, the jury reasonably could have found Kelly was acting knowingly. And similarly, when Kelly forced S.K. and Terry into the

home and held them there, the jury could have reasonably found he acted knowingly. We see no inconsistency as to violate statutory double jeopardy.

### C. *Admission of KRE[5] 404(b) Evidence.*

Kelly's third argument is that the trial court erred in admitting KRE 404(b) evidence of a prior incident of unlawful imprisonment involving his fiancée as well as his prior use of methamphetamine. The Commonwealth contends that the introduction of such evidence was proper, it being offered to show intent or lack of mistake. We find no abuse of discretion in admitting the evidence.

Prior to trial, the Commonwealth provided its notice of intent to introduce other crimes, wrongs, or acts pursuant to KRE 404(b). The Commonwealth sought to have admitted evidence of two specific prior acts: a 2016 incident wherein Kelly discharged a firearm during an attempt to enter another's residence and an incident occurring on August 7, 2020, fifteen days before the incident at issue, wherein Kelly was alleged to have held his fiancée, Vanessa Crotser,[6] against her will in their home with a firearm.[7] The trial court partially allowed the Commonwealth to introduce its evidence. Evidence of the 2016 incident was excluded as not substantially relevant or probative

---

[5] Kentucky Rules of Evidence.

[6] Vanessa Crotser testified as Vanessa Kelly at trial. To avoid confusion, we refer to her by her first name herein.

[7] At the time of trial in this matter, Kelly had not yet resolved the charges in the case involving Vanessa. After he was convicted here, he pled guilty to charges of receiving stolen property (firearm), first-degree unlawful imprisonment, tampering with physical evidence, and first-degree wanton endangerment.

14

and overly prejudicial.  Evidence of the August 7 incident was allowed, the court finding the prior event to be similar enough to the current occasion to be relevant and probative and the value of the evidence not outweighed by the prejudice to Kelly.  However, evidence concerning dissimilar offenses for which Kelly was charged in the August 7 incident was excluded.[8]  The trial court further included a limiting instruction related to the August 7 incident as part of the guilt-phase instructions provided to the jury during trial.[9]

At trial, the August 7 incident was first raised on the Commonwealth's cross-examination of Kelly.  Kelly denied that he unlawfully imprisoned Vanessa and that the argument between them began over information on a cell phone.  The Commonwealth further asked if Kelly used methamphetamine during the incident with Vanessa, to which Kelly admitted methamphetamine use in the recent past.  Defense counsel objected to the testimony, but the trial court allowed the questioning, reasoning defense counsel opened the door by eliciting testimony from Kelly's mother-in-law that Kelly seemed under the influence during the Lee incident.

Vanessa was called in rebuttal by the Commonwealth.  Vanessa denied being unlawfully restrained by Kelly, but admitted he had a gun in the room

---

[8] The trial judge did not allow the Commonwealth to introduce evidence concerning the offenses of receiving stolen property (firearm), tampering with physical evidence, or firing shots during the incident (presumably referring to the charge of second-degree assault).

[9] In the relevant portion, the instruction directed the jury to "consider the evidence [of the August 7 incident] only as it relates to the Commonwealth's claim of Mark E. Kelly's intent or absence of mistake.  You must not consider it for any other purpose."

where the incident occurred.  The Commonwealth also elicited further testimony regarding incidents of methamphetamine use by Kelly.

Evidentiary issues are reviewed for abuse of discretion.  *See, e.g., Brewer v. Commonwealth*, 206 S.W.3d 313, 320 (Ky. 2006).  "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999).

As a general rule, "prior acts of violence or threats of violence against persons other than the victim in the case on trial . . . are inadmissible." *Driver v. Commonwealth*, 361 S.W.3d 877, 885-86 (Ky. 2012) (quotation omitted).  However, such evidence may be admissible "if offered for another purpose or inextricably intertwined with other evidence essential to the case." *Sherroan v. Commonwealth*, 142 S.W.3d 7, 18 (Ky. 2004) (citations omitted).  In other words, the proffered evidence must comport with KRE 404(b). *Gabbard v. Commonwealth*, 297 S.W.3d 844, 858 (Ky. 2009).

KRE 404(b) provides,

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible:

(1)     If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]

We have described this provision as exclusionary in nature and found that "exceptions allowing evidence of collateral criminal acts must be strictly construed." *Leach v. Commonwealth*, 571 S.W.3d 550, 554 (Ky. 2019).

16

However, the list provided in KRE 404(b)(1) is illustrative rather than exhaustive. *Tamme v. Commonwealth*, 973 S.W.2d 13, 29 (Ky. 1998) (citing R. Lawson, *The Kentucky Evidence Law Handbook*, § 2.25, at 87 (3rd ed. 1993)).

We have set forth a three-prong test to determine the admissibility of other bad acts evidence: "(1) Is the evidence relevant? (2) Does it have probative value? (3) Is its probative value substantially outweighed by its prejudicial effect?" *Leach*, 571 S.W.3d at 554 (citing *Purcell v. Commonwealth*, 149 S.W.3d 382, 399-400 (Ky. 2004); *Bell v. Commonwealth*, 875 S.W.2d 882, 889 (Ky. 1994)). The first prong may be satisfied by a determination that the proffered evidence adheres to KRE 404(b)(1) and is being used to prove material facts actually in dispute. *Id.*

If the evidence is relevant, then the trial court must determine if the evidence is probative. This burden is met by a showing that the "jury could reasonably infer that the prior bad acts occurred and that [the defendant] committed such acts." *Parker v. Commonwealth*, 952 S.W.2d 209, 214 (Ky. 1997).

Finally, if the evidence is both relevant and probative, then the trial court must determine "if the potential for undue prejudice substantially outweighs the probative value of the evidence." *Leach*, 571 S.W.3d at 554. If so, then the evidence must be excluded. The prejudice must go beyond that which is merely detrimental to a party's case and be of such character that it "produces an emotional response that inflames the passions of the triers of fact or is used

17

for an improper purpose." *Id.* (quoting R. Lawson, *The Kentucky Evidence Law Handbook*, § 2.25[3][d], at 135 (4th ed. 2003)).

Here, the Commonwealth argues the evidence was properly admissible to show intent or lack of mistake. The Commonwealth sought to show that Kelly used the gun and forced Terry and S.K. into the home with the intent of restraining them. Defense counsel argued prior to and during trial that what occurred in the Lee home did not stem from a desire to cause harm to Terry and S.K., but rather from a period of confusion brought on by either methamphetamine use or a mental health episode.[10] In either case defense counsel explained what happened to the victims in the Lee home as an unfortunate mistake, that Kelly had the gun for self-defense and that he locked Terry and S.K. in the home not to prevent them from leaving, but to prevent others from entering the home to get to Kelly.

We find no abuse of discretion in allowing the evidence of the prior imprisonment of Vanessa. The evidence went to Kelly's intentions that day and addressed Kelly's defense that what occurred was a mistake and a misunderstanding. That Kelly had engaged in substantially similar behavior only fifteen days prior to what occurred at the Lee home was probative of Kelly's mental state during the incident at issue here. Part of Kelly's case at

---

[10] At various points before and during trial, the strategy of defense counsel appeared to vary between describing the event as caused by the methamphetamine use to claiming that methamphetamine played no role in a mental health episode. Ultimately, and as Kelly points out, no affirmative defense regarding Kelly's mental health was raised by trial counsel and no experts were produced to testify as to Kelly's mental state at the time of the Lee incident.

18

trial—and part of his argument on appeal—was that he possessed the gun for purposes unrelated to endangering the Lee home and unrelated to holding the people in the Lee home against their will. Evidence that Kelly used a weapon to hold another person against her will not long before incident at the Lee home spoke to an essential element of the crimes for which Kelly was charged. Accordingly, the KRE 404(b) evidence was both relevant and probative.

Finally, we address whether the evidence's prejudicial effect overcame its probative value. We hold it did not. Certainly, the evidence was prejudicial to Kelly's case, but it was not "unfairly prejudicial," *Price v. Commonwealth*, 31 S.W.3d 885, 888 (Ky. 2000), or such as to "induce the jury to decide the case on an improper basis." *Brown v. Commonwealth*, 313 S.W.3d 577, 619 (Ky. 2010). The fact, as described at trial, that Kelly had engaged in another instance of unlawful imprisonment undoubtedly caused the jury to consider guilt a stronger possibility. Nonetheless, we cannot say the evidence inflamed the passions of the jurors or that it was used for an improper purpose. Ultimately, the probative value of the prior bad acts evidence outweighed the prejudicial effect of its introduction. For this reason, we are unable to say that the trial judge committed an abuse of discretion in allowing the evidence to be presented.

### D. Improper Argument by Commonwealth During Sentencing.

Finally, Kelly argues that the Commonwealth made two errors during the sentencing phase that mandate returning this matter to the trial court for re-sentencing. Specifically, Kelly argues that the Commonwealth committed

19

palpable error when it (1) expressed its disappointment that the jury had acquitted Kelly of burglary and (2) when the Commonwealth invited the jury to take into consideration Kelly's potential parole eligibility date while setting his punishment.

This issue was not preserved at the trial level, so Kelly requests review palpable error pursuant to RCr[11] 10.26.[12] We have said that for an error to be considered palpable it must "be so egregious that it jumps off the page . . . and cries out for relief." *Chavies v. Commonwealth*, 374 S.W.3d 313, 323 (Ky. 2012). The party seeking palpable error review must establish "the probability of a different result or error so fundamental as to threaten his entitlement to due process of law." *Brooks v. Commonwealth*, 217 S.W.3d 219, 225 (Ky. 2007) (citation omitted).

When reviewing alleged instances of prosecutorial misconduct for palpable error, we have set forth some relevant criteria:

> An appellate court's review of alleged error to determine whether it resulted in "manifest injustice" necessarily must begin with an examination of both the amount of punishment fixed by the verdict and the weight of evidence supporting that punishment. Other relevant factors, however, include whether the Commonwealth's statements are supported by facts in the record and whether the allegedly improper statements appeared to rebut arguments raised by defense counsel. Finally, we must always

---

[11] Kentucky Rules of Criminal Procedure.

[12] RCr 10.26 states,

> A palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.

20

consider these closing arguments "as a whole" and keep in mind the wide latitude we allow parties during closing arguments.

*Young v. Commonwealth,* 25 S.W.3d 66, 74-75 (Ky. 2000).

Our review of the prosecutor's statements regarding the acquitted burglary charge reveals no error. The full context of the prosecutor's statements indicates that the statement was not an attempt to "shame jurors or attempt to put community pressure on juror's decisions," *Cantrell v. Commonwealth,* 288 S.W.3d 291, 299 (Ky. 2009), but was rather an exhortation for the jury to consider all the evidence that had been put before them, including the evidence relating to the charge on which it ultimately acquitted Kelly. Although we are mindful of Kelly's concerns that such a statement could be considered a sanction for a prior acquittal, we do not believe that the statements at issue here, placed in their full context, exceed the "wide latitude" we allow during closing arguments. Accordingly, we find no palpable error in the Commonwealth's statements.

As to the Commonwealth's discussion of Kelly's parole eligibility date, the Commonwealth apparently concedes error, arguing only that the error did not rise to the level of manifest injustice. However, we note that KRS 532.055 explicitly permits the introduction of evidence of a defendant's "[m]inimum parole eligibility[.]" KRS 532.055(2)(a)(1). *See also Boone v. Commonwealth,* 780 S.W.2d 615, 61-17 (Ky. 1989) (holding both Commonwealth and defendant may introduce evidence of minimum parole eligibility). We have found discussion of parole eligibility to be error where misinformation was provided to

21

the jury,[13] but no party alleges such misinformation was given here.  Our review of the Commonwealth's closing argument similarly revealed no misinformation.  We find no error in the Commonwealth's discussion of Kelly's minimum parole eligibility date during the sentencing-phase closing statement.

### III.    Conclusion.

For the foregoing reasons, we affirm the Marion Circuit Court in all respects.

All sitting.  All concur

COUNSEL FOR APPELLANT:

Erin Hoffman Yang
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

Joseph A. Beckett
Assistant Attorney General

---

[13] *See, e.g.*, *Beard v. Commonwealth*, 581 S.W.3d 537 (Ky. 2019) (prosecutor's misstatement regarding parole eligibility for violent first-degree burglary was misconduct); *Robinson v. Commonwealth*, 181 S.W.3d 30 (Ky. 2005) (prosecutor's incorrect statements regarding good time credit were misconduct).