RENDERED: DECEMBER 14, 2023
TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0236-MR

JAIKORIAN J. JOHNSON                                          APPELLANT

V.
ON APPEAL FROM DAVIESS CIRCUIT COURT
HONORABLE LISA PAYNE JONES, JUDGE
NO. 21-CR-00342

COMMONWEALTH OF KENTUCKY                                      APPELLEE

**OPINION OF THE COURT BY JUSTICE CONLEY**

**AFFIRMING IN PART & REVERSING IN PART**

This case comes before the Court on appeal as a matter of right[1] by Jaikorian Johnson, the Appellant, from the judgment and sentence of the Daviess Circuit Court. Johnson was convicted of second-degree manslaughter and four counts of first-degree wanton endangerment. He was sentenced to twenty-years imprisonment. Johnson makes three arguments on appeal: 1) the trial court erred in excluding the testimony of two witnesses regarding the alleged criminal scheme of the victim at the time of the shooting; 2) the trial court erred in failing to direct verdicts on all four counts of wanton endangerment; and 3) the victim impact statement of the victim's mother was improper and prejudicial during the penalty phase. We disagree with the first

---

[1] Ky. Const. § 110(2)(b).

two arguments but agree as to the latter argument. Consequently, we affirm Johnson's convictions but remand for a new penalty phase.

## I.     Facts

Johnson was walking to his house with a friend on August 15, 2020. They were travelling east on West Fifth Street, in Owensboro. Around 10:30 p.m., the boys[2] heard a moped coming up behind them. The moped had no muffler so was unusually loud and was also capable only of a speed around 20-25 miles per hour. The moped was driven by Raedon Pitman. Corban Henry was his passenger seated behind him. According to Johnson, Henry drew a gun on him. Johnson fled in the opposite direction, westward, and fired blindly behind him five rounds from his own handgun. Pitman testified that he felt a sting similar to being shot with a pellet from an airsoft gun. He kept driving the moped only for Henry to eventually tell him he had been shot. Pitman stopped the moped and Henry succumbed to his injury at the scene.

It was later determined that the bullet that struck and killed Henry had passed through him and grazed Pitman. An airsoft gun was recovered on Henry's person at the scene. Multiple witnesses testified at trial that he possessed the gun beforehand. Police officers who responded to the scene also testified that the gun lacked any identifying features that would have made it plain it was not a real weapon just by looking at it.

---

[2] Johnson was a minor at the time of the shooting and had been transferred to the Circuit Court's jurisdiction as a youthful offender under the pre-2021 version of KRS 635.020(4).

Johnson was eventually located that same night at a neighbor's house. Johnson and his friend were found in one room, while a 9mm Taurus pistol and a 9mm SCCY pistol were found in a bag belonging to Johnson in a separate room. Johnson does not contest the Taurus was his own weapon. Testing revealed the five shell casings recovered on West Fifth Street matched the Taurus. DNA evidence also linked Johnson to the Taurus. Johnson would not be formally arrested regarding the homicide until eight months later.

A Grand Jury indicted Johnson for, among other things, murder, criminal attempt murder, and four counts of first-degree wanton endangerment. A five-day trial ensued. At trial, Johnson made a self-defense argument. He received instructions regarding self-defense and imperfect self-defense. The jury acquitted Johnson of murder and criminal attempt murder, and instead found him guilty of second-degree manslaughter as to the death of Henry, and fourth-degree assault as to the wounding of Pitman. It also found him guilty of all four first-degree wanton endangerment counts—one for each of the other rounds he fired.

The jury recommended thirty-one years total, the maximum sentence if served consecutively. The parties agreed though that the sentencing cap applied, and the maximum sentence Johnson could receive was twenty years. The trial court imposed the twenty-year sentence. Johnson now argues several errors. First, he alleges the trial court abused its discretion in prohibiting the testimony of two witnesses (one partially, the other wholly) who would have testified that Henry and Pitman were on their way to commit a robbery of some

3

other person when the shooting occurred. Second, he argues a directed verdict for the four counts of wanton endangerment in the first degree should have been granted because the Commonwealth failed to put on evidence that a person was in the vicinity of Johnson who was in substantial danger of death or serious physical injury. Finally, he argues the victim impact statement of Henry's mother was prejudicial and reversible error since it included multiple Biblical quotes urging the death penalty, as well as several unproven accusations that Johnson engaged in acts of witness intimidation against her and gloating over the death of her son.

Further facts will be developed below. We now proceed to the merits.

## II. Analysis

### A. No Abuse of Discretion in Excluding Character Evidence of Victim

Johnson sought to introduce the testimony of two sisters, Amelia and Angelina Cates, who testified by avowal. The avowal testimony demonstrates the sisters would have testified that at the time of the shooting, the victims, Henry and Pitman, were travelling to Smothers Park with the intent of robbing a man named Jameson. Johnson argues the exclusion of this testimony prejudiced his ability to put on a full defense, as evidence that Henry intended to rob another person with his airsoft gun (that looked like a real gun) was "key to painting the full picture of fear Jaikorian was feeling when he saw a gun pointed at him by Corban [Henry] and he acted in self-defense." The issue is preserved.

4

Evidentiary rulings of a trial court are reviewed for an abuse of discretion. *Commonwealth v. Bell*, 400 S.W.3d 278, 283 (Ky. 2013). Indeed, "we will not reverse a correct evidentiary decision by the trial judge . . . [even if] made 'for the wrong reason.'" *Lopez v. Commonwealth*, 459 S.W.3d 867, 875 (Ky. 2015). Before we discuss the specific case law, we note that Johnson's self-defense theory was amply supported by the evidence below. Angelina Cates testified to Henry's possession of the airsoft gun. The living victim, Pitman, also testified that Henry was in possession of the airsoft gun. Testimony from one of the responding officers to the scene also noted the existence of the airsoft gun, as well as its similarity to an actual gun. Finally, Johnson took the stand in his own defense and testified that Henry pointed this airsoft gun at him. Johnson's evidence must have been convincing enough to the jury because they acquitted him as to murder, and instead only convicted him for second-degree manslaughter under an imperfect self-defense theory. As Johnson admitted in his reply brief, his testimony "that he saw a gun pointed in his direction from one of the persons on the moped was enough to demonstrate his real and present fear."

The trial court excluded the testimony regarding Henry's and Pitman's alleged plan to rob another person at Smothers Park as irrelevant because the shooting did not occur at Smothers Park, the testimony did not suggest Johnson was the intended victim of the robbery, and there was no testimony that immediately prior to the shooting any words had been exchanged between Johnson and Henry demonstrating an attempted robbery. We agree the

5

evidence was properly excluded as irrelevant though on slightly different grounds.

The true issue is "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." KRE[3] 404(b). "[T]he unaltered proposition of the rule is that 'evidence of criminal conduct other than that being tried, is admissible only if probative of an issue independent of character or criminal predisposition, and only if its probative value on that issue outweighs the unfair prejudice with respect to character.'" *Bell v. Commonwealth*, 875 S.W.2d 882, 888-89 (Ky. 1994) (quoting *Billings v. Commonwealth*, 843 S.W.2d 890, 892 (Ky. 1992)). Johnson's argument is that this testimony supports his self-defense theory as providing full context for his own conduct. The leading cases are *Saylor v. Commonwealth*, 144 S.W.3d 812 (Ky. 2004), and *Ragland v. Commonwealth*, 476 S.W.3d 236 (Ky. 2015).

In *Saylor*, we explained "a homicide defendant may introduce evidence of the victim's character for violence in support of a claim that he acted in self-defense . . . [,][h]owever, such evidence may only be in the form of reputation or opinion, not specific acts of misconduct." *Saylor*, 144 S.W.3d at 815.

> An exception exists . . . when evidence of the victim's prior acts of violence, threats, and even hearsay evidence of such acts and threats, is offered to prove that the defendant so feared the victim that he believed it was necessary to use physical force (or deadly physical force) in self-protection . . . .

---

[3] Kentucky Rules of Evidence.

*Id.* "But for such evidence to be relevant and admissible for this purpose, the defendant must have known of the victim's prior bad acts at the time he purportedly acted in self-defense." *Ragland,* 476 S.W.3d at 253. In *Saylor,* we concluded that evidence of police records demonstrating three prior acts of violence of which the defendant was not previously aware was not prejudicial to the defendant. *Saylor,* 144 S.W.3d at 815. In *Ragland,* we held that testimony of the victim's prior, multiple robberies was properly excluded first, because it was "offered to show that he was a violent person and that he acted in conformity with that violent character in this instance," 476 S.W.3d at 253, and second, the defendant did not claim to have been aware of the robberies prior to the fatal encounter. *Id.* Johnson's citation to *Bush v. Commonwealth,* 335 S.W.2d 324 (Ky. 1960), is unavailing. There the Court did say "[a] defendant is entitled to show why he believed it was necessary to shoot and kill in self-defense . . . ." *Id.* at 326. But Johnson critically leaves out that in that case, the defendant "did testify that he had heard of threats made against him by [the] deceased." *Id.* at 325. What the trial court prohibited from being introduced was "not threats, but mere bad feelings of [the] deceased." *Id.* at 326.

Johnson was permitted to testify why he thought it was necessary to shoot in self-defense, and Henry's possession of an airsoft gun that looked, for all intents and purposes, like a real gun supported his testimony. As he concedes, it was "enough to demonstrate his real and present fear." The only possible basis of admitting the evidence of an alleged robbery scheme was to

7

support Johnson's own state of mind, i.e., that he feared the victim; and the proffered testimony is obviously not reputation or opinion evidence. Johnson, however, did not testify that he knew or even believed that Henry and Pitman were planning on perpetrating a robbery prior to the shooting. "[A] defendant's fear of being physically harmed by another cannot have been influenced by violent acts that the defendant knew nothing about." *Id.* Thus, as in *Ragland*, we do not believe the relevancy of the alleged robbery scheme was established. Without Johnson's personal knowledge of an alleged robbery plan against his own person, the only function such testimony could have had is to suggest to the jury that because Henry may have been intending to rob somebody else, he was trying to rob Johnson—"which is, of course, a prohibited use of other-bad-acts evidence under KRE 404(b)." *Id.* The trial court is affirmed.

## B. Directed Verdicts for Four Counts of Wanton Endangerment

Johnson's next argument is that he should have been granted a directed verdict on the four counts of first-degree wanton endangerment because the evidence failed to identify any person in Johnson's vicinity when he fired his gun aimlessly that was placed in substantial danger of death or serious physical injury. The issue is preserved.

> The legal standards for a directed verdict motion are clear: "[i]f under the evidence as a whole it would not be clearly unreasonable for a jury to find the defendant guilty, he is not entitled to a directed verdict of acquittal." *Trowel v. Commonwealth*, 550 S.W.2d 530, 533 (Ky. 1977). "The trial court must draw all fair and reasonable inferences from the evidence in favor of the party opposing the motion, and a directed verdict should not be given unless the evidence is insufficient to sustain a conviction. The evidence presented must be accepted as true. The credibility and

8

the weight to be given the testimony are questions for the jury exclusively." *Commonwealth v. Sawhill*, 660 S.W.2d 3, 5 (Ky. 1983). The standard for appellate review is equally clear: "[o]n appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991).

*Eversole v. Commonwealth*, 600 S.W.3d 209, 217-18 (Ky. 2020).

"A person is guilty of wanton endangerment in the first degree when, under circumstances manifesting extreme indifference to the value of human life, he wantonly engages in conduct which creates a substantial danger of death or serious physical injury to another person." KRS 508.060(1). The wanton endangerment statute is "designed to protect each and every person from each act coming within the definition of the statute. It is not a statute designed to punish a continuous course of conduct." *Hennemeyer v. Commonwealth*, 580 S.W.2d 211, 215 (Ky. 1979). "The differences between first- and second-degree wanton endangerment are the mental state and degree of danger created. As to the mental state, both crimes require wanton behavior, but first-degree also requires 'circumstances manifesting extreme indifference to the value of human life[.]'" *Swan v. Commonwealth*, 384 S.W.3d 77, 102 (Ky. 2012).

> As to the danger created, first-degree requires a substantial danger of death or serious physical injury, whereas second-degree requires only a substantial danger of physical injury. The distinction between the two degrees of the crime was described in the commentary in part as follows:
>
>> Creation of the two offenses is necessitated by the wide differences in dangerousness that exist with the various types of wanton conduct. For example,

9

aimlessly firing a gun in public is not as wanton in degree as firing a gun into an occupied automobile and should not carry the same criminal sanction.

KRS 508.060 Kentucky Crime Commission/LRC Commentary (1974).

*Id.*

Johnson and the Commonwealth are in agreement that Johnson "blind fired" his weapon; he was not aiming at anything or anyone in particular. Accordingly, Johnson argues, based on the LRC Commentary to KRS 508.060, his conduct is exactly that which the legislature deemed to be second-degree wanton endangerment: "aimlessly firing a gun in public." The Commonwealth argues that Raedon Pitman, two witnesses, and the fact that there was a nearby park where people allegedly were congregated, as well as the fact that the shooting occurred in a residential neighborhood, were sufficient to support that some person's life was actually placed in a substantial danger of death or serious physical injury for each shot fired.

Preliminary to our discussion, we reject the Commonwealth's suggestion that the law does not require the Commonwealth to prove that a specific individual's life was in the vicinity and was thus placed in danger of death or serious physical injury by the wanton conduct for there to be first-degree wanton endangerment—there is "not a single case that stands specifically for that proposition," says the Commonwealth. The statute, however, does stand for that proposition. One cannot be guilty of first-degree wanton endangerment if his conduct does not, in part, create "a substantial danger of death or serious physical injury *to another person.*" KRS 508.060(1) (emphasis added). In a case

10

which relied upon our interpretation of KRS 508.060, we wrote "the issue of whether a defendant's conduct creates a substantial risk of death or serious physical injury 'depends upon proof' and . . . [must be] [t]rue or real; not imaginary." *Bell v. Commonwealth,* 122 S.W.3d 490, 497 (Ky. 2003). The Commonwealth has no valid interest in protecting hypothetical persons who do not exist. The law is meant to criminalize conduct that affects real people who were *really* placed in substantial danger by a defendant's wanton conduct. If that element is not met, then the wanton conduct, though perhaps criminal in some other manner, is not punishable as wanton endangerment.

Our cases regarding firearms and first-degree wanton endangerment do in fact show that specific and identifiable persons existed who were in substantial danger from the wanton conduct. In *Hennemeyer,* the first-degree wanton endangerment convictions at issue were supported by the fact that "[w]hile in pursuit . . . the movant, who was a passenger in the fleeing car, leaned out of the right front window and over a period of approximately fifteen minutes fired five shots from a 30.30 rifle at and into the police car." 580 S.W.2d at 213. An additional shot was fired while fleeing on foot. *Id.* In *Combs v. Commonwealth,* we affirmed the refusal to give a second-degree wanton endangerment instruction because the conduct of the defendant was that "[i]n the struggle Combs managed to get possession of Brown's pistol and fired two shots while Brown had him on the ground. One of the shots was discharged when, Tony Slone, another Kroger employee, was standing right beside the gun." 652 S.W.2d 859, 860 (Ky. 1983). Combs fired the gun a total of six times,

11

with "[o]ne of the shots . . . discharged in the immediate vicinity of the foot of Tony Slone, another was fired almost point blank at Officer Brown but missed him, and another of the shots came within fifteen feet of Scott Warrell as he was fleeing." *Id.* In *Hunt v. Commonwealth*, we affirmed the denial of a directed verdict when an infant was in the same room where her grandmother was murdered and "the bullets flew within a matter of feet of Katrina [the infant]." 304 S.W.3d 15, 38 (Ky. 2009). In *Paulley v. Commonwealth*, we affirmed the nine counts of first-degree wanton endangerment because there were nine people present inside the home into which the defendant fired only three shots. 323 S.W.3d 715, 724 (Ky. 2010). Finally, in *Swan*, we held a directed verdict should have been given on a first-degree wanton endangerment charge because one of the victims "was not in the immediate vicinity of those fired shots." 384 S.W.3d at 103. No shot was ever fired in her direction, no gun was ever pointed at her, and she was in a different part of the house the entire time. *Id.* In short, we concluded "it is difficult to conceive of an actual danger of death or serious physical injury to which Ms. Lumpkins was exposed." *Id.*

Johnson, too, has also made an unavailing argument in an attempt to illustrate the Commonwealth's alleged failure of proof on this element, by citing the jury instructions. If there is a problem with the jury instructions, we decline to express an opinion on it now since Johnson has not requested palpable error review for the sufficiency of the instructions. *Shepherd v. Commonwealth*, 251 S.W.3d 309, 316 (Ky. 2009). Jury instructions and motions for directed verdict are distinct issues and "are reviewed differently[.]"

12

*Smith v. Commonwealth*, 636 S.W.3d 421, 434 (Ky. 2021). "[T]he specific facts as described in the jury instructions have no bearing on our review of the trial court's ruling on a motion for directed verdict." *Id.*

Despite the Commonwealth's earlier argument, it has identified at least three persons who were in Johnson's vicinity when he fired his weapon: Robert and Karen Crowe, and Raedon Pittman. As for the Crowes, the evidence established the shell casings where the gun was fired were in front of 1508 West Fifth Street, and Henry and Pitman were travelling eastward towards Kendall Perkins Park. The evidence established and the Commonwealth has argued (both at trial and on appeal) that Johnson was firing his gun eastward and endangering persons who may have been in the park. But the Crowe residence is on the corner of West Fifth Street and Castlen Street, and from the perspective of where the shell casings were recovered, is westward from Kendall Perkins Park and in the same direction that Johnson was running when he fired the shots. In other words, Johnson was running towards the Crowe residence and firing blindly behind him eastward. Elementary laws of physics dictate the utter impossibility of any of those bullets hitting Robert or Karen Crowe thus they cannot be said to have been in substantial danger of death or serious physical injury. "[T]he issue of whether a defendant's conduct creates a substantial risk of death or serious physical injury 'depends upon proof' and reasonable inferences that can be drawn from the evidence." *Bell*, 122 S.W.3d at 497 (internal citation omitted). Based on the physical facts of this case, it was clearly unreasonable for a jury to conclude that bullets fired eastward

13

placed someone in the exact opposite direction in substantial danger of death or serious physical injury. Hypothetical scenarios about what Johnson might have done to place them in danger if he had committed some other action or movement that he did not in fact commit cannot defeat a motion for directed verdict. *Id.* at 498 (rejecting existence of substantial risk of danger based on hypothetical that police officer may have drawn his weapon during pursuit when there was no evidence the officer had in fact drawn his weapon).

Nonetheless, the evidence demonstrates beyond cavil that Pitman was in the vicinity when each of the five rounds were fired. One of the five rounds struck and killed Henry, who was riding on the moped with Pitman. That bullet passed through Henry and wounded Pitman. Thus, it was not clearly unreasonable for the jury to believe that Pitman was in the vicinity when the other four rounds were fired. Per KRS 508.060, "each of the [four] shots constituted a separate offense, [therefore] the movant was not twice placed in jeopardy for the same offense." *Hennemeyer*, 580 S.W.2d at 215. The trial court's refusal to direct verdicts for first-degree wanton endangerment is affirmed.

## C. Victim Impact Statement Palpable Error

This issue is unpreserved and is reviewed for a manifest injustice. RCr[4] 10.26. To find manifest injustice we "must plumb the depths of the proceeding" to discover whether "the defect is so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process." *Martin v. Commonwealth,*

---

[4] Kentucky Rules of Criminal Procedure.

14

207 S.W.3d 1, 4-5 (Ky. 2006). "A palpable error must be so grave in nature that if it were uncorrected, it would seriously affect the fairness of the proceedings." *Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006). The essential question is whether a "substantial possibility" exists that "the result in the case would have been different without the error." *Id.*

Ms. Henry, the mother, during the penalty phase of trial, gave a prepared statement. She included several quotations and references to the Bible, including Deuteronomy 19:11-12;[5] Leviticus 24:17;[6] Numbers 35:31;[7] and Matthew 18:6.[8] She further commented,

> Mine and his brother's futures and our happiness have been ripped away yet you will not receive a life sentence for killing our innocent Corban for no reason at all other than the hate your heart is full of, that you have put on full display proudly for the world to see that you have no remorse, you plan to kill again, and you and your friends have threatened or harassed anyone that supported justice for Corban. This includes driving down my road, dancing in your doorway as we chant 'Justice for Corban' at the place where my son died, shooting over the candlelight prayer vigil we had for Corban, telling little girls you are the shooter and posting on social media, 'Her son got it the worst,' after you drove down my street on the opposite side of town trying to intimidate me, and I told you then that you were going to get caught. If the parole board believes the public should take another chance on a person who has zero

---

[5] "But if any man hate his neighbour, and lie in wait for him, and rise up against him, and smite him mortally that he die, and fleeth into one of these cities: Then the elders of his city shall send and fetch him thence, and deliver him into the hand of the avenger of blood, that he may die." (King James Version).

[6] "And he that killeth any man shall surely be put to death." (King James Version).

[7] "Moreover ye shall take no satisfaction for the life of a murderer, which *is* guilty of death: but he shall be surely put to death." (King James Version).

[8] "But whoso shall offend one of these little ones which believe in me, it were better for him that a millstone were hanged about his neck, and *that* he were drowned in the depth of the sea." (King James Version).

remorse for killing a child he did not know, then who posted on social media, 'Enjoy the Spring because n-words dying this summer,' if the jury believes putting another random innocent child's life in danger to afford an evil killer a second chance to do it again, I will make sure that this does not happen because any consideration of you walking free again is not justice.

A victim has the right "to be heard in any proceeding involving a release, plea, [or] sentencing . . . ." Ky. Const. § 26A. Furthermore, evidence may be offered in the penalty phase as to "[t]he impact of the crime upon the victim or victims, as defined in KRS 421.500, including a description of the nature and extent of any physical, psychological, or financial harm suffered by the victim or victims[.]" KRS 532.055(2)(a)7. A victim may not make sentencing recommendations in the penalty phase under the guise of a victim impact statement. *Hilton v. Commonwealth*, 539 S.W.3d 1, 18-19 (Ky. 2018). Acts of uncharged misconduct are also "inadmissible in the penalty phase." *Foster v. Commonwealth*, 827 S.W.2d 670, 682 (Ky. 1991).

Marsy's Law, as embodied in Section 26A of our constitution, enshrines the right of a victim to make an impact statement. But there is nothing in Section 26A that expands the subject matter of what a victim may testify to in their impact statement. Victim impact statements are of relatively recent vintage, but widespread. *See* Paul G. Cassell, *In Defense of Victim Impact Statements*, 6 Ohio St. J. Crim. L. 611, 614 (2009) (locating the specific origin of victim impact statements in time to the 1970s, and stating that by the time of publication thirty-two states had provided for victim impact statements in their constitution; sixteen others guaranteed the right through statute or case

16

law; and the final two states allowed victim impact statements at the discretion of the trial judge.).

KRS 532.055(2)(a)7 was created in 1998. Prior to that, victim impact statements were allowed but only presented to the trial judge, and not read to the jury. KRS 421.520; *Brown v. Commonwealth*, 780 S.W.2d 627, 630 (Ky. 1989). KRS 421.520 was passed in 1986. As such, a wealth of decisions from the appellate courts of Kentucky discuss what constitutes victim impact evidence and when it is permissible to be put before the jury. The right to make a victim impact statement in Section 26A is to be understood within that context. We see nothing in the text of Section 26A that adds anything new to the law. Thus, Section 26A constitutionally enshrines a right that is then delineated with more specificity in KRS 532.055(2)(a)7 and KRS 421.520, with the accompanying cases interpreting those statutes.

The Commonwealth argues that Ms. Henry never made a sentencing recommendation. It is true, technically; but her several quotations of Biblical scripture all pertained to imposing the death penalty and were all-but-telling the jury death was the appropriate punishment in this case, even if the law forbade it. We do not hold this portion of the statement is palpable error by itself. Other statements by Ms. Henry acknowledged that the jury could not impose the death penalty. Additionally, religious belief cannot be separated from issues of life and death. The Supreme Court of the United States has held, "[v]ictim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question,

17

evidence of a general type long considered by sentencing authorities." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991). This specifically includes "demonstrating the loss to the victim's family and to society which has resulted from the defendant's homicide." *Id.* at 822. We cannot reasonably expect, much less require, a victim not include their religious beliefs in such a scenario. We stress that this decision would be the same even if the victim were a Muslim quoting the Qur'an, a Buddhist quoting the Pali Canon, or a Hindu quoting the Vedas. We also believe the jury is readily capable of understanding that such religious references are to be considered as nothing more than the product of a grieving victim and the means of expressing that grief. Here, however, the Bible verses quoted or referenced specifically called for death of the criminal for killing another person, a penalty not authorized for the crime of which Johnson was convicted. The statements skirted the line of impropriety but as stated earlier, do not rise to palpable error.

The other statements of Ms. Henry, however, went well-beyond the bounds of propriety. She accused Johnson of at least two additional crimes— shooting over a candlelight vigil (another act of wanton endangerment) and acts of intimidating a participant in a legal proceeding. She accused Johnson of other acts and statements that amounted to gloating over the death of Henry to third parties and on social media. We have held in capital cases, "specific acts of uncharged misconduct are not factors which a jury may consider in its determination of a defendant's penalty and, therefore, are inadmissible in the penalty phase." *Foster,* 827 S.W.2d at 682. We have applied this rule to non-

capital cases as well. *Miller v. Commonwealth*, 394 S.W.3d 402, 407-08 (Ky. 2011).

Henry testified to uncharged acts of misconduct that were obviously criminal in nature and reflected upon Johnson's consciousness (or lack thereof) of guilt. We must also agree with Johnson that the several unfounded accusations that he committed further criminal acts, including intimidation, must have caused the jury to believe "they had been hoodwinked by the defense in the merits phase." This is because the jury had just determined that Johnson was not guilty of murder. Instead, the jury concluded he had acted with a justifiable belief in self-defense but had been mistaken about the requisite degree of force. The accusations that Johnson subsequently committed acts of intimidation against Henry's mother, shot over a candlelight vigil for Henry, and gloated to any who would care to listen about Henry's death, surely caused the jury to question its decision. This is suggested by the jury's recommendation of maximum sentences for each conviction to be served consecutively, in spite of the sentencing cap. KRS 532.110. Had the sentencing cap not been in place, the jury would have seen Johnson imprisoned for thirty-one years, instead of twenty. Finally, it is telling that the Commonwealth ignored these specific accusations in its briefing as if they never occurred, despite being quoted by Johnson in his brief and forming the chief part of his argument. As the ancient precept of law made infamous by Sir Thomas More has it, *qui tacet consentire videtur*—he who is silent seems to agree.

After reviewing the record, we conclude the admittance of this testimony did "seriously affect the fairness of the proceedings." *Brewer*, 206 S.W.3d at 349. We believe a substantial possibility exists that but for the admission of this testimony, the jury would not have recommended the maximum sentence possible and, therefore, conclude a palpable error occurred. Consequently, we reverse the sentence of Johnson and remand for a new penalty phase.

### III. Conclusion

For the aforementioned reasons, we affirm the convictions of Johnson. We reverse his sentence and remand for a new penalty phase consistent with this opinion.

All sitting. All concur.


COUNSEL FOR APPELLANT:

Emily Rhorer
Alana Meyer
Assistant Public Advocates

COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

Thomas Allen Van De Rostyne
Assistant Attorney General